UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACQUELINE PEREZ,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>　　　　Defendant. | Case No.: 1:14-cv-00914- JLT<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT, CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF JACQUELINE PEREZ |

Plaintiff Jacqueline Perez asserts she is entitled to disability insurance benefits under Title II of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the credibility of her subjective complaints. Because the ALJ identified clear and convincing reasons in support of the adverse credibility decision, the administrative decision is **AFFIRMED**.

## BACKGROUND

On November 5, 2010, Plaintiff filed her applications for benefits, in which she alleged disability beginning September 18, 2009. (Doc. 11-3 at 3) The Social Security Administration denied the applications at the initial level and upon reconsideration. (*Id.*; Doc. 11-5 at 2-10) Plaintiff requested a hearing, and testified before an ALJ on February 27, 2013. (*Id.* at 19, 35) The ALJ determined Plaintiff was not disabled under the Social Security Act, and issued an order denying benefits on March 7, 2013. (*Id.* at 19-28) Plaintiff filed a request for review of the decision with the Appeals Council,

which denied the request on April 16, 2014.  (*Id.* at 2-4)  Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security.

## **STANDARD OF REVIEW**

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## **DISABILITY BENEFITS**

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment.  *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

**ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.     Relevant Medical Evidence**

Dr. Jian Lin performed a neurologic consultation on Plaintiff on June 11, 2008. (Doc. 11-8 at 82) At that time, Plaintiff reported she had headaches "almost daily or every other day," could cause nausea and photosensitivity. (*Id.*) Plaintiff also said she had "numbness and tingling sensation in both hands from the wrists to the fingertips on and off," which "was more common when [s]he was using the computer keyboard." (*Id.*) Dr. Lin found Plaintiff's sensations were "[i]ntact to light and pinprick," and her strength was "5/5." (*Id.* at 83) Further, Dr. Lin found Plaintiff's results from a nerve conduction study and needle EMG examination were "normal." (*Id.* at 85) Dr. Lian concluded there were "no electrical findings for carpal tunnel syndrome, ulnar neuropathy, or cervical radiculopathy."

On August 11, 2008, Plaintiff had x-rays taken of her right and left hands. (Doc. 11-8 at 107-108) Dr. Michael Wells reviewed the images and found osteoporosis in the joints of her fingers, which he believed was "consistent with rheumatoid arthritis." (*Id.*)

Dr. Kenneth Hsu performed a rheumatologic evaluation on October 1, 2008. (Doc. 11-8 at 104) Plaintiff reported she had aches in her "elbows, shoulders, left hip, [and] left knee," but not in her "hands, wrists and feet and ankles." (*Id.*) In addition, Plaintiff said she had "[m]orning stiffness [for] less than 10 minutes," and did not have "difficulty in dressing, arising, opening a new carton of milk or walking." (*Id.*) Upon examination, Dr. Hsu found Plaintiff had "multiple tender points in [her] elbows, anterior chest wall, neck, trapezius, gluteal, anserine, [and] Achilles." (*Id.* at 105) Dr. Hsu believed the findings were "[c]linically suggestive of fibromyalgia, rule out seronegative rheumatoid arthritis." (*Id.*)

Dr. Hsu noted ordered arthritis panels, which came back negative. (*Id.* at 105, 101) Dr. Hsu believed these results were was compatible with fibromyalgia. (*Id.* at 101)

Dr. Kristof Siciarz performed an internal medicine consultative examination on April 12, 2011. (Doc. 11-8 at 12) Plaintiff reported she had "intermittent body aches since childhood," and was diagnosed in 2002 with fibromyalgia. (*Id.*) She told Dr. Siciarz she had "joint pain, muscle aches, weakness and fatigue," but "continued to work with these symptoms until about 2009 when her symptoms became severe enough that she had to stop working." (*Id.*) Dr. Siciarz found no spinal tenderness or evidence of inflammation. (*Id.* at 14-15) In addition, Plaintiff's range of motion was normal in her back, shoulders, elbows, wrists, hips, knees, and ankles. (*Id.*) Dr. Siciarz determined that Plaintiff's muscle strength was "5/5" in her arms and legs. (*Id.* at 15) Based upon the examination, Dr. Siciarz opined: "[A]t this time the functional capacity is not limited in this claimant, from an internal medicine perspective." (*Id.* at 16)

On April 20, 2011, Dr. Lucy Sauer opined Plaintiff was "not fully credible" because there was "no objective evidence to support [the] extent of limitations" Plaintiff reported in her activities of daily living. (Doc. 11-8 at 21) Accordingly, Dr. Sauer opined that Plaintiff's physical impairments were "non severe." (*Id.*)

Dr. James McNairn completed a psychiatric evaluation on August 27, 2011. (Doc. 11-8 at 27) Plaintiff reported she had "anxiety, depression, stress, irritability, and impaired concentration and memory." (*Id.*) She told Dr. McNair the symptoms began "two years ago," and she attributed the onset "to stress at home with her husband and children" as well as "stress at work when she was employed." (*Id.* at 27-28) Plaintiff said her symptoms "occurred intermittently since the onset and have decreased." (*Id.* at 28) She told Dr. McNairn she "complete[d] all household chores including cooking, cleaning, laundry, sweeping, and mopping, depending on her pain and energy levels." (*Id.* at 29)

Dr. McNairn determined Plaintiff's thought process was "organized and logical," and the content of thought "was appropriate with no report or evidence of hallucinations, delusions, paranoia or psychotic thinking." (Doc. 11-8 at 29-30) Dr. McNairn found Plaintiff's recent and remote memories were "intact," and she "was able to follow simple and short instructions." (*Id.*) He concluded Plaintiff's symptoms were "consistent with a mild mood disorder," and diagnosed Plaintiff with

"Adjustment disorder with mixed anxiety and depression." (*Id.* at 31) Dr. McNairn concluded Plaintiff's "ability to perform simple and repetitive tasks is not impaired," though she was "mildly impaired" with "complex and detailed tasks." (*Id.* at 31) Further, Dr. McNairn opined her "ability to maintain regular work attendance and complete a normal workday and workweek without psychological problems [was] mildly impaired." (*Id.*) Dr. McNairn believed Plaintiff's "problems are treatable," and that she "would benefit from supportive counseling and a psychiatric medication review." (*Id.* at 32)

On September 8, 2011, Dr. Jerry Henderson noted Plaintiff did not report a "remarkable" history of formal treatment. (Doc. 11-8 at 39) Dr. Henderson concluded Plaintiff's mental impairments were "not severe." (*Id.*, emphasis omitted)

Dr. Khong reviewed the medical record on May 15, 2012, and observed that the treatment sessions were "few and far between." (Doc. 11-8 at 47) According to Dr. Khong, this was "not typical for an individual who has fibromyalgia." (*Id.*) Dr. Khong noted Plaintiff "alleged that since 9/11, she has had more foot pain and cannot walk without a cane." (*Id.*) Dr. Khong found "no medical evidence to support this allegation," and noted that Plaintiff failed to attend her second consultative examination. (*Id.*) Dr. Khong concluded there was "insufficient evidence" to offer a "current" residual functional capacity, and believed the "credibility of the claimant's self-stated limitations is poor." (*Id.*)

In September 2012, Plaintiff visited Kern Family Health Care, where she was treated by Fathima Gutierrez, NP. (Doc. 11-8 at 67) She reported she had an insurance change and needed to re-establish care. (*Id.*) Plaintiff told Ms. Gutierrez that she had a history of arthritis and fibromyalgia, and requested that she be able to see Dr. Hsu. (*Id.*) In addition, Plaintiff reported she had "joint pain [and] stiffness," as well as pain in her low back, neck, and shoulder. (*Id.* at 69) She described the pain as "8/10 at its worst." (*Id.* at 72) Ms. Gutierrez determined Plaintiff had "[n]ormal musculature," and a "normal range of motion for all four extremities for age." (*Id.*)

On October 30, 2012, Plaintiff reported she suffered from "itchy eyes, itchy throat, sneezing and watery eyes," and had taken medication in the past. (Doc. 11-8 at 63) Plaintiff requested that Ms. Gutierrez complete paperwork for CalWorks, and said she was "in the process of obtaining [Social Security]." (*Id.*) Ms. Gutierrez noted she had only treated Plaintiff on one prior occasion, and

informed Plaintiff that her medical records were "not sufficient to establish disability." (*Id.*)

Plaintiff returned to Dr. Hsu for treatment on January 9, 2013. (Doc. 11-8 at 97) Plaintiff reported "swelling pain in in joints, hands, feet, [and] low back." (*Id.*) In addition, she said she "ha[d] morning stiffness lasting for 2-3 hours." (*Id.* at 99) Dr. Hsu noted Plaintiff had "a history of seronegative rheumatoid arthritis diagnosed in 2008," and a "history of generalized aching which is compatible with fibromyalgia." (*Id.* at 95) Dr. Hsu noted Plaintiff had a "nodule between [her] right 1st and 2nd finger," as well as "multiple tender points in the typical location for fibromyalgia." (*Id.*)

Dr. Hsu ordered new x-rays of Plaintiff's hands, which were taken on January 11, 2013. (Doc. 11-8 at 93-94) Dr. Girish Patel reviewed the results and determined Plaintiff's left hand was normal, because there was "normal alignment," "[t]he joint spaces were preserved" and there were" [n]o erosive changes." (*Id.* at 94). Dr. Patel found Plaintiff's right hand was also normal, with the exception of "[m]inimal degenerative changes of the distal interphalangeal joint of the fifth finger." (*Id.* at 94)

### B.     Administrative Hearing Testimony

Plaintiff testified that she was employed by the County of Kern until 2009, when she "started to be very ill and in a lot of pain," which caused her to miss work. (Doc. 11-3 at 39) Plaintiff reported she went on disability leave, and then her insurance "lapsed because [she] had already missed so much work." (*Id.*) Plaintiff asserts the time came for her to return to work or provide a note from a doctor extending her leave, but she could not afford to go to the doctor, so she quit her job. (*Id.* at 39-40)

After she left the County, Plaintiff said she and her husband opened several stores—including a thrift store, a party supply store, and a medi-physical supply store— which she said "didn't work out." (Doc. 11-3 at 40-41) She explained that although she was officially self-employed, she "wasn't able to show up," and her husband and children "were basically running the store." (*Id.* at 40) Plaintiff said she would be in on Fridays and Saturdays because they were "the busiest days," to "make sure everything was opened and running and give any advice or information." (*Id.* at 41)

She believed she was no longer able to work full-time, but thought she "might be able to work one or two days, maybe part-time, but the times vary." (Doc. 11-3 at 42) Plaintiff reported her pain levels changed, "so [she] can be good one day," but not the next. (*Id.*) For example, Plaintiff said she

had physical therapy the day before the hearing, after which she "had to lay down… and didn't do anything" because of the pain in her back. (*Id.*)

She reported that she remained uninsured until she was granted Medi-Cal in "May or June" of 2012. (Doc. 11-3 at 43) Plaintiff explained she did not want to apply for welfare because she was hoping her husband would get a job or that they could take care of themselves, so she was "holding out as long as [she] could." (*Id.*) Plaintiff reported that while she was unemployed, she treated her fibromyalgia and pain by drinking "heavily" and getting Vicodin and Motrin from her brother. (*Id.* at 43-44) Plaintiff reported that after she visited a doctor again, she received her own prescriptions for Vicodin, Ibuprofen, Robaxin, and Cymbalta. (*Id.* at 44)

Plaintiff testified that the medications "help a little bit," but never "take the pain completely away." (Doc. 11-3 at 45) She said the medicine helped her to sleep, but if she slept in the same position, then she could be more sore than when she went to sleep. (*Id.* at 45-46) She reported she felt pain in her lower back, shoulders, neck, both elbows, both wrists, left hip, both knees, and both ankles. (*Id.* at 46)

She estimated that she was able to sit "[m]aybe 45 minutes to an hour," and stand for "a little bit less than 45 minutes" at one time. (Doc. 11-3 at 46) Plaintiff believed she could "walk short distances from . . . like the handicap space to the front door," for a total of about ten minutes. (*Id.* at 47) Also, she believed she was able to lift "about five or 10 pounds." (*Id.*) Plaintiff explained that if she did any more physical activities exceeding these durations, she felt "burning, tingling" in her legs and back, and then "the next day [she was] not able to move." (*Id.*) Plaintiff then clarified that movement would "very painful" and, though she "may be able to get out of bed and do normal things," she would "lay around" at home. (*Id.*)

Plaintiff reported that, although she did household chores when she was "feeling up to it," her husband and children "pretty much try to keep the house clean," and her husband did most of the cooking. (Doc. 11-3 at 47) She stated that her children helped with the laundry, so she would measure the soap and set the capacity and temperature, "but the kids put the clothes in the . . . washer and remove them and also load and remove the clothes from the dryer." (*Id.* at 48) Further, Plaintiff said her husband helped her bathe and dress, because her arthritis made it painful. (*Id.* at 49)

She testified she spent her days watching television would "nap most of the time." (Doc. 11-3 at 50) She reported that she had "difficulty seeing even with glasses," so she did not read, although she would "get on the computer on occasion" to check her email, Facebook, and watch the news. (*Id.*) Plaintiff said that from about November 2011 to March 2012, she "stayed in bed the whole time," which caused her to gain about 20 pounds. (*Id.* at 52-53) She testified, "[S]ince then, I've been trying to get up and move a little bit. I've been doing therapy and trying to stretch, do my exercises, so my body doesn't completely give out on me." (*Id.* at 53) Plaintiff said that during the summer she would do water exercises and swim, which helped "a little bit." (*Id.* at 58) She reported that she had "less mobility" in the winter, and being in hot water helped her pain. (*Id.*) However, Plaintiff estimated she spent about six hours each day lying down. (*Id.* at 57-58)

**C.     The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial activity after the alleged disability date of September 18, 2009. (Doc. 11-3 at 21) Second, the ALJ found Plaintiff "has the following severe impairments: seronegative rheumatoid arthritis, fibromyalgia, obesity, and adjustment disorder with mixed anxiety and depression." (*Id.*) These impairments did not meet or medically equal a listed impairment. (*Id.* at 21-22) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except frequent gripping, grasping, handling, fingering and feeling with the bilateral upper extremities. Additionally, the claimant cannot work in the cold, and must alternate between sitting and standing every hour, staying in the new position for an hour thereafter. Further, the claimant remains capable of performing simple, repetitive, routine, unskilled tasks.

(*Id.* at 22) With this residual functional capacity, the ALJ found Plaintiff retained the ability to perform "jobs that exist in significant numbers in the national economy," including work as a photocopy machine operator, cashier, and office helper. (*Id.* at 26-27) Accordingly, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 27)

**DISCUSSION AND ANALYSIS**

Plaintiff's sole argument in her appeal is that the ALJ failed to properly evaluate the credibility of her subjective complaints. (*See generally* Doc. 13 at 6-10) When evaluating a claimant's credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment

8

"which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Next, if there is no evidence of malingering, the ALJ must make specific findings as to the claimant's credibility. *Id.* at 1036.

An ALJ must base an adverse credibility determination on clear and convincing evidence where there is no affirmative evidence of malingering and "the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). Factors that may be considered include, but are not limited to: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct; (3) the claimant's daily activities, (4) treatment received (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). To support a credibility determination, the ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996).

Here, the ALJ determined Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Doc. 11-3 at 25) However, the ALJ found her "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible." (*Id.*) To support these conclusions, the ALJ considered Plaintiff's failure to seek treatment and gaps in the medical record, as well as objective findings in the record. (*Id.*) Plaintiff argues these are not clear and convincing reasons to support her lack of credibility. (Doc. 13 at 6, 7-9)

1.   Failure to seek treatment and gaps in treatment

The Ninth Circuit has determined a claimant's "failure to seek treatment" supports an adverse credibility determination. *Fair*, 885 F.2d at 603. Similarly, an ALJ may determine a claimant's statements are "less credible if the level or frequency of treatment is inconsistent with the level of complaints." SSR 96-7p, 1996 SSR LEXIS 4, at *21. Thus, minimal treatment may suggest a lower level of pain and functional limitations than a claimant alleges. *See Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995); *see also Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("unexplained, or

inadequately explained, failure to seek treatment . . . can cast doubt on the sincerity of the claimant's pain testimony"). When rejecting testimony for gaps in treatment, an ALJ "must not draw inferences about an individual's symptoms and their functional effects . . . without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek treatment." SSR 96-7p, 1996 SSR LEXIS 4, at *22. For example, the Ninth Circuit has held gaps in treatment do not constitute a clear and convincing reason for discounting credibility if the claimant lacked the financial ability to pay for treatment. *Orn*, 495 F.3d at 638 (9th Cir. 2007).

Here, the ALJ found there was "a significant gap" in the medical record. (Doc. 11-3 at 25) The ALJ explained that if Plaintiff "were really as impaired as she claims, [he] would expect her to obtain the treatment she needs rather than wait close to three years to seek treatment." (*Id.*) Further, the ALJ observed: "Even after the claimant obtained Medi-Cal coverage, it took her 6 months to see someone at Bakersfield Family Care, and, from the notations in the record, it appears she went there mostly to get an excuse from the work requirement for Cal WORKs and not because of her alleged impairments and pain." (*Id.*) Thus, the ALJ acknowledged that Plaintiff said she was uninsured for several years, but found she delayed in seeking treatment for six months after obtaining insurance. Because Plaintiff failed to explain her delay in seeking treatment, the ALJ properly found the six-month gap supported an adverse credibility determination.[1] *See Burch v. Barnhart,* 400 F.3d 676, 681 (9th Cir. 2005) (the ALJ properly considered a "three to four month" gap in treatment in discrediting claimant's testimony regarding her levels of pain); *see also Lisell v. Colvin,* 2015 U.S. Dist. LEXIS 141983 at *19 (C.D. Cal. Oct. 16, 2015) (finding a claimant's delay in seeking treatment for about six months was "a clear and convincing ground" supporting the ALJ's adverse credibility finding).

2. The medical record and lack of treatment

In general, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir.

---

[1] Notably, the ALJ's analysis is supported by the opinion of Dr. Khong, who reviewed the medical record and explained that gaps in treatment were "not typical for an individual who has fibromyalgia." (Doc. 11-8 at 47)

1999). The Ninth Circuit explained that "testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence," but "the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins*, 261 F.3d at 857. Because the ALJ did not base the decision solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff, the objective medical evidence was a relevant factor in determining Plaintiff's credibility.

However, if an ALJ cites the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to make a simple statement that the testimony is contradicted by the record. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination"). Rather, an ALJ must "specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (an ALJ "must state which . . . testimony is not credible and what evidence suggests the complaints are not credible").

Here, the ALJ found that "[t]he clinical treatment record is limited and does not support the claimant's allegations of complete disability." (Doc. 11-3 at 24) The ALJ noted Plaintiff testified that she needed "to lie down 6-hours every day," and concluded, "the record itself will not support such a limitation." (*Id.* at 25) In addition, the ALJ found the record did not support Plaintiff's reported "extremely limited lifting, sitting and standing/ walking restrictions." (*Id.*) The ALJ noted that Plaintiff had normal EMG and nerve root conduction studies, and x-rays of her hands were "normal," with the exception of "only minimal degenerative changes to the fifth finger" on Plaintiff's right hand. (*Id.* at 25) Further, the ALJ observed that Dr. Siciarz found Plaintiff's "physical examination was within normal limits," and she had "no physical limitations." (*Id.*) Accordingly, the ALJ carried the burden to identify evidence—including findings of a physician that Plaintiff did not have physical limitations — undermining the credibility of Plaintiff's complaints.

## CONCLUSION AND ORDER

For the reasons set for above, the Court finds the ALJ identified clear and convincing reasons to find Plaintiff's subjective complaints lacked credibility that were "sufficiently specific to permit the

court to conclude the ALJ did not arbitrarily discredit [the] claimant's testimony." *Thomas*, 278 F.3d at 958. Because the ALJ applied the proper legal standards and set forth clear and convincing reasons to support the adverse credibility determination, the ALJ's determination that Plaintiff is not disabled must be upheld by the Court. *Sanchez*, 812 F.2d at 510.

Accordingly, **IT IS HEREBY ORDERED**:

1. The decision of the Commissioner of Social Security is **AFFIRMED**;
2. Defendant's motion for summary judgment is **GRANTED**; and
3. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, and against Plaintiff Jacqueline Perez.

IT IS SO ORDERED.

Dated:   **October 27, 2015**            /s/ Jennifer L. Thurston
                                         UNITED STATES MAGISTRATE JUDGE